The next case, number 22-1064 and number 23-1100, Savannah Kinzer et al. v. Whole Foods Market, Incorporated. At this time, would counsel for the appellants please introduce herself on the record to begin? Good morning, Your Honors. I'm Shannon List Riordan for the plaintiffs. I will be sharing my time with the National Labor Relations Board, who will be taking five minutes. And I'd like to reserve three minutes, please, for rebuttal. Yes, you may. Thank you. So, Your Honors, the case that is before you today is a very straightforward textbook case of retaliation under Title VII. Unfortunately, the district court here did its own fact-finding and decided to grant summary judgment against the three plaintiffs who claimed retaliatory discharge. The facts here are very similar to the Travers v. FSS case, which I argued to you a number of years ago. There is no dispute in this case that all three plaintiffs engaged in protected conduct, both participatory and oppositional conduct that is protected by Title VII. There is no question that all three suffered adverse action. They were all terminated. The question for the jury was whether or not there's a causal relationship between their termination and their protected activity. The district court judge said, well, there's not much evidence here to support their claim of retaliation, but not much means that there's some. There is no dispute that there was close temporal proximity. Each of them engaged in protected activity over a period of time, which led to them getting disciplinary points. But then the actual final termination for each of them. You said they got disciplinary points for their oppositional activity? Yes. I thought they got disciplinary points for wearing a mask with a slogan on it or for being missing attendance. Those are the only, what else did they get points for? Right. They got disciplinary points for they were, they started wearing Black Lives Matter masks. They thought that Whole Foods would support them because it was imparting a similar message to its customers. Whole Foods instead, to their surprise, responded by disciplining employees who were doing so. And so that got protests even more dramatic as they protested the way Whole Foods responded to their wearing the masks, which they reasonably believed to be discriminatory and retaliatory. Your position is that wearing a mask with a slogan is protected activity? Yes. And the district court did not disagree. They believed that they were. Why? Is that protected activity? Why isn't a reasonable dress code, and I understand your argument that it wasn't evenly enforced, but if they had a dress code that says you can't do it and there was no issue that, are you saying that there was an issue that the dress code was in response to them engaging? They reasonably believed that their continuing to wear the masks after Whole Foods told them not to was protesting the policy of not letting them. But even putting that aside, each of them engaged in additional clearly protected activity. Savannah Kinzer filed an EEOC charge and told her manager that before she was terminated. Mr. Michneau wrote on disciplinary forms he got that he believed that the store was engaged in racist conduct. He complained about discrimination against black employees. Higher management looked at those messages and then he got terminated. I just want to be clear. The record reflects that that kind of activity they engaged in. But are you saying that when we think about this case later on, that you're not pressing the notion that the masking constituted protected activity? I'm just saying that's one part of the protected activity. Let's put the masks aside altogether. Ms. Kinzer filed an EEOC charge and told her manager about that. Mr. Michneau told his manager that he was hiring an attorney to bring a Title VII claim. Ms. Evans complained of discrimination because she heard racist remarks in the workplace that weren't actually taken care of. Excuse me. I think you're quite right. The record is clear that there is temporal proximity between the engagement of your clients in protected activity and their termination. The district court judge acknowledged that. But you started out by saying that the district court seemed to acknowledge there may be some evidence of retaliation and that it therefore means that summary judgment should have been denied. Correct. But do you agree that the standard of causation here is a very tough standard. It's but for causation. Right? You agree with that? Yes. Okay. So just so you can know my question so you can fully respond to it. So even if retaliation may have been a factor, may have played some role in the decision to terminate, that's not the same as but for causation. And what the district court seemed to be saying in a scenario where you have with respect to all three of your clients, this accumulation of points from this disciplinary procedure that they had, that that accumulation of points was a big factor, the district court seemed to be saying, in the decision to terminate them. So in that scenario, even if they were annoyed by some of the conduct of your clients, that isn't what was driving the decision ultimately. I mean, how do you deal with the requirement of but for causation in a scenario like that? Well, again, this is a factual issue for a jury to decide what was the actual but for reason for the termination. So think about savanna cancer for a moment. So no reasonable jury could find but for causation in this scenario? I mean, that's the kind of judgment that courts are entitled to make. Well, that's the same judgment that the district court made in the Travers case, which this court reversed. In that case, the district court decided, no, the plaintiff here engaged in conduct that was clearly allowed to be a terminable offense. He solicited a tip. This company never allowed solicitation of tips. So end of story, period. He did that. That was it. This court rightly reversed that and said, well, no, a reasonable jury could decide that there's some discretion here. And for each of the three of these plaintiffs, there was discretion. But in Travers, didn't the CEO say he wanted the person fired because of the demonstration? Yes. And what happened in that case was the district court. That's pretty glaring evidence. And the only question was there a causal nexus. And we found when the CEO tells the CEO's two reports, rid me of that cleric, they will rid you of that cleric. Right. Right. In that case, they denied that the person who actually made the decision knew that the CEO wanted the plaintiff fired. In this case. Going back to this case. Yes. Okay. Page 22 of your brief. Yes. You're right, and it seems accurate from the record that the disciplinary policy and the warnings, quote, put employees who continued to wear BLM attire on a path towards termination. And the record seems clear on that. And she got repeated, Ms. Kisler got repeated warnings, and then a final written warning, and then tells the employer, oh, I've made this charge. Yes. If we were to say that that, therefore, creates a jury issue, that in and of itself, we set up this horrible incentive that if you think you're going to get fired, at the last second, make some charge, and then you get a jury trial? So, Your Honor, remember the reason that Ms. Kinzer was actually fired wasn't because of the mask. It was because of cumulative points, including her attendance on that last day. If I can just explain. On the last day, her bike tire was stolen. Her supervisor said, well, I don't know what we're going to do about this, and there's evidence in the record that that was a discretionary decision that they were deciding, are we going to fire her because she was late because of her stolen bike tire? So her supervisor met in an office with hire management, which was very unusual for hire management to be involved, and they talked about it for a couple of hours to decide. They made a discretionary decision to decide whether to terminate her. We have evidence in the record that upper management recognized her as an agitator. They called her an agitator. So let's take the first point, all right? They fired her for the bike tire because she was an agitator. That's something a jury could find. Would you like us to focus on your points? Yes. Okay, let's take the first point. Yes. Hire management got involved, spent time doing it. Why does that generate an adverse inference? For one thing, given Black Lives Matter, given what was going on in the store, the demonstrations, the news coverage, isn't it inconceivable that any manager would make any decision concerning her without checking with higher-ups, indeed checking with counsel? And don't we want companies to do that rather than just automatically firing without consulting? And that's an excellent argument that defense counsel can make to the jury at the end of the trial, but the jury could also reasonably decide that higher-ups were making a discretionary decision about do we let this agitator off the hook when she got her bike tire stolen or not. It was a decision. So suppose they infer, yes, they were making a discretionary decision. Yes. You need them to infer that they were making the decision that they made because of the oppositional conduct. Because she was a leader in engaging in protected conduct and she had filed an EEOC complaint. So they did find out before they made the decision that she filed the EEOC complaint. I understand what you're saying about the incentive to at the last minute file something, but it is true that they hadn't decided to fire her. Even when she showed up that day late because of the bike tire, they didn't say, okay, you're out. You know your points. You're there. They thought about it. But they started disciplinary action against her way earlier than that. Right, but the discipline that we're challenging here is her termination. They didn't decide that until the day that they found out she had filed an EEOC charge. Counsel, wasn't there, this must have been in a deposition, I thought there was testimony, maybe this was the floor manager, maybe it was the supervisor, who in the course of a deposition said in effect or said explicitly that if this had been somebody else, if it had not been your client who was seen as an agitator, that the policy of forgiveness, if you will, for reasons that you can't control accounting for your late attendance, that the outcome might have been different. Was there testimony to that? Yes, there was. Who was that? That was the supervisor who when she came in late that day she said, I don't know what upper management is going to say there. And then they went and they thought about it. But, yes, she did say at her deposition, perhaps if it was someone else, she wouldn't have gotten fired. That's evidence in the record, and the jury can consider that. There's similar evidence also for the other two also that, again, they had, yes, they had engaged in this oppositional behavior before, but what actually happened before they got fired, Haley Evans had complained that there was racist comments in the store and that they weren't being handled appropriately. Upper management got involved and was looking into her complaints. Mr. Mishno similarly was complaining about discrimination against black employees in the store. This is apart from wearing the mask. Upper management got into looking at all of their situations and decided to fire them. They didn't have to decide to fire them. The jury can decide whether they fired them because they were making these protected, engaged in this protected activity. It's just a very simple fact issue for a jury here for all three of them. Is there any evidence that any employee accumulated the number of violations and warnings that these plaintiffs did and was not let go? There were a number of employees who accumulated points because of wearing the Black Lives Matter masks. These three were the only ones who were terminated. These three were also seen as ringleaders. That wasn't quite my question. Was there anyone who accumulated as many points got to the point of a final warning, still did a violation, and didn't get fired? Again, I don't think that's completely clear from the record, but, again, if you look at Travers, the argument that the defense made that led to the district court granting summary judgment was, oh, no one was quite in his circumstance. No one had solicited TIP as brazenly as he did. And this court said, but still there was subjectivity and there was protected conduct, so it's a question for the fact finder whether there was a causal connection. So it's the same token here. The defense can argue no one got as many points as they did, and the jury can decide, well, is it because Savannah Kinzer got to that number of points or was it because she was an agitator and they decided to fire her when she got her bike tire stolen? Counsel, the district court explicitly said that you had represented that there would be evidence of employees, you would present evidence of employees who had accumulated a similar amount of disciplinary points but were not terminated. And the district court said you never produced that evidence. It looked for it and said it was never presented. Right. But, again, there was discretion for each of these. I don't see how this is not a fact issue for a jury. I mean, that's an argument that they can make to the trial jury that, well, nobody else got the reason that three of them were terminated was because they reached X number of points, not because they were the ringleaders and were particularly outspoken. That's the question. That's the fact issue. Dependents always say. Is there anyone who wore the mask who didn't accumulate points? Well, I mean, Mr. Michneau, early on, he didn't get any points. It's in the record. He didn't get any points at first. But then when he started complaining about racism in his store and discrimination against black employees, then they started giving him points. Anyone else? I think it's in the record that they didn't start giving out disciplinary points immediately when the employees started wearing Black Lives Matter masks. When they started doing it repeatedly, that's when upper management got involved. They decided to crack down on it and start giving out disciplinary points for it. Across the board? I think across the board.  The day that Savannah Kinzer got fired, higher management had a decision, do we fire her or not? Do we turn the other way because her bike tire got stolen, which we may have done, as the supervisor said, if it was somebody else, but because she was an agitator, we enforced it strictly. It's the same thing that happened in the Travers case. There was no dispute that tip solicitation was against the rules of the company. But there's a question in how strictly management enforces those rules. The jury in the Travers trial ended up deciding that they were overly strict in how they enforced it because other employees who weren't quite in the same situation got a break, who weren't lead plaintiffs in class actions, and other employees who engaged in even worse conduct didn't get fired. So, I mean, here, again, it's for a jury to decide. Was it because Savannah Kinzer was an agitator? Was it because Haley Evans complained that the store was not responding to racist comments? They were shutting down Black Lives Matter masks, but letting employees get away with making racist comments, which she thought created a hostile environment. Was it for Chris Micheno? Was it because he continued wearing the mask? Or was it because he was telling his supervisors that he thought they were engaged in discriminatory conduct? This is a classic case of a fact issue for a jury to decide for each of those. Any more questions? Thank you. Okay, and on the issue, there's a very important discovery issue. You saved time for rebuttal. Yes, okay, so the NLRB will argue the discovery issue, and I'll rest on the brief for that. Thank you. Thank you, counsel, at this time of counsel for the NLRB. We'll introduce himself on the record if we can. Good morning. David Bem for the National Labor Relations Board. The NLRB urges remand on the question of protections afforded to discovery for confidential activity of employees and those whose assistance they seek. It's protected by Section 7 of the National Labor Relations Act. The NLRB for decades has recognized this confidentiality interest. Two circuit courts have agreed that it's well settled that employees enjoy this interest, but the district court discounted this interest wholesale. When you say wholesale, I thought some precautions were taken. Could you clarify the record as to exactly what information the employer has? I thought the names were, at least on what's been given to us, the names were whited out or blacked out. So there were redactions that were ordered. The names are not the sole. No, but we're not obviously talking about wholesale rejection of your position, then, if there's blackouts. Let me clarify. In the court's order on the question of National Labor Relations Act confidentiality interest, it said no interest applied to this case that it was bound to consider. So the record that we have, though, what information was obtained by the employer? My understanding is it was text messages or Facebook messages among employees regarding their activity. And you say your understanding is you haven't reviewed them? I don't have the information that was filed under steel that's correct. Well, how about the text messages with the names blacked out? Do you have that? I have seen that, but I couldn't speak specifically to that. So what is it the employer has that the employer should not have? Information among employees, discussions among employees about their activities to improve their conditions at work or to address an issue, a grievance among certain employees is protected if it seeks to induce or initiate or prepare for some kind of group action that includes litigation, that includes wearing masks, or I shouldn't have brought in a mask, wearing insignia in the workplace. And is it the board's position that the discovery to any of this at all, even with names blacked out and the like, is categorically a violation of the board requirements? No, that is not the position. The board's holding in Guess Incorporated in 2003 sets forth the standard that the board applies. First it examines the relevance of the information to the case. If the information is relevant, it would then examine whether the discovery was propounded for an improper or an unlawful purpose under the NLRA. If neither of those factors are met, it would then balance the need of the litigants' interests for the discovery. Counsel, in reading your brief, you go at great length to say that making clear that the Guess framework is, you go to great pains to point out the Guess framework would be consistent with the discovery rules of civil procedure. That left me with the view, frankly, that, well, the rules as they stand without imposing the Section 7, the Guess framework on the discovery process, are quite adequate to deal with the confidentiality issues, the balancing issues, the question of whether there's a no legal objective, the question of relevance. All those issues are readily accommodated by the rules as they stand. Why is there a need to add this particular framework to the civil rules? Well, courts that have been examining this issue, frankly, have been getting it wrong. So I think the practice of the board and the board's cases are a useful guideline to give to courts, and this court's role as a court of appeals, I think, is appropriate to issue a decision that would direct the district courts to better understand this issue. District courts generally don't have much interaction with the NLRA, with the exception of enforcing subpoenas and certain preliminary injunction matters. So I think the understanding of what is protected by Section 7 of the Act is lacking. That's a current for many of these cases. Some courts discount the importance of Section 7 altogether as a confidentiality interest. So I think the guest framework is simply an overlay that allows the courts to... You can finish. I'm sorry. The guest framework is an overlay that would permit courts to better understand the issues and actually examine the labor interests involved. Just very quickly, counsel, your opponents point out that there are jurisdictional issues here. Why aren't they right that we have both sort of looking backward? We have a mootness issue in the sense that the production at issue was already produced. That cannot be undone. So there's a mootness issue. And then looking forward, there's a ripeness issue because we have no idea how any of this information might be relevant to a future court proceeding if we were to remand. We don't know what would evolve at a trial. It could evolve in such a way that none of this material might be relevant to anything. I'll take the last point first with regard to ripeness. The district court made findings and legal conclusions in the case below, and if that's not corrected on appeal, it would govern. It would be a law of the case. It would govern its future determinations regarding admissibility of evidence. This is a law of the case argument. The judge has already dug in on the issue. Is that your point? I believe that's correct. Once the case is appealed, that's your opportunity to challenge that, and if you don't, you accept that. With respect to the mootness issue, here again, it's a matter of how this information can be used, and also it's not that there is no remedy that could be issued. As we said in the brief, the court could issue a new protective order that would reconsider the material to see if it was subject to further protection. It would also govern how it might be used in further proceedings. So an issue comes up under the discovery rules, under Rule 26. Someone asks for discovery. The person who the request is made says, I've got some interest against discovery. This stuff is confidential. It seems to me at base what the board wants is some judicial recognition that when we're talking about employees who are getting together to oppose workplace conditions, there is some confidentiality interest there that needs to be taken into consideration. It's a legitimate concern. That's correct, and it's not limited to union organizing. No, it's employees in the workplace talking about work conditions. Yes. The difficulty of reaching that here, though, is usually discovery rules aren't appealable. Rules aren't appealable unless you take a contempt, refuse to comply, and then you get to appeal. So if we were to reverse the decision on the case, the merits of the case, it would go back and there would be a trial, and you could appeal after the trial, I suppose. But then since you've already produced it, you've got a mootness issue. So that's what we're trying to grapple with. I mean, they also, the appellants preserved their objections below, so I don't think that there are issues as to how this was produced. They could ask the information back. Obviously, we can't have the appellants unlearn the information, but there are remedies that can be hooked in. So would they be seeking to preclude use of that information at trial? I mean, I think that's a decision that could only be made by the trial judge in the context of what particular information is sought and for what purpose. But that would be an example of maybe not mootness, if you see the point. Correct, yes, because that decision would have to take into account the Section 7 interests. Thank you. Thank you. Thank you, counsel. At this time, counsel for the appellee will introduce himself on the record to begin. He has a 15-minute response. Good morning, Your Honors. I am Michael Banks, and I represent Whole Foods Market. I'd like to begin, if I may, with just two short quotes from this Court's prior opinion in June of 2022 when the case was last in front of the panel. I was appearing by Zoom at that point. The Court noted that common sense suggests that Whole Foods would have had non-race-based reasons in June 2020 for prohibiting the wearing of Black Lives Matter masks, and it went on to say, continuing discipline of an employee for repeated violations of the dress code is not evidence that Whole Foods had a retaliatory motive. I submit that ruling, those two critical points, set the stage for the retaliation claims that then went through the discovery process and in which plaintiffs had ample opportunity to demonstrate, as Your Honors questioned, whether there were employees who were treated differently or whether the reasons articulated by Whole Foods for the termination were implausible or irrational. And there is no such evidence. But, for instance, the appellant points to other evidence in the record suggesting that these employees complained about work conditions and racism in the workplace, and so they're not relying, as they say, totally on the masking issue, but the other workplace problems in addition to the specific complaints that they made. And that was credited appropriately by the District Court, that the plaintiffs, these three plaintiffs, did complain about other issues in the workplace. The question, though, is not why they complained. That may go to whether they engaged in protected conduct. But why were they terminated? We have three plaintiffs who admit, unlike the Travers case, admit that they repeatedly and deliberately flouted a Whole Foods dress code that this court has found to be nondiscriminatory and lawful. If we look at the evidence for the three of them, it's abundantly clear. Ms. Evans showed up for work on June 22, 2020, wearing a Black Lives Matter mask, was told to take it off. She refused and was sent home. So let's see if we can cut to the chase some, because the record's clear that they violated the policy and were repeatedly warned. So there's certainly plenty of evidence that they were fired for that reason. But the plaintiff is saying there's more than a minimal amount of evidence that they wouldn't have been fired had they not also engaged in oppositional behavior, filed Title VII and stuff. So the question for us is that alternative version of causation put forward by the plaintiff, is there enough evidence to support that so that we have a jury trial as to whether they fired for reason A or reason B? And the evidence that I've heard they've pointed to, evidence by testimony by a supervisor speculating that they were saying to some effect that they wouldn't have been fired maybe perhaps if they hadn't been agitators. What do you have to say about that? There was evidence that plaintiffs put on that a supervisor questioned on the last lateness by Ms. Kinzer whether Whole Foods might exercise its discretion and not terminate her when she reported that she was admittedly late, but for a benign reason. She said it was outside of her control. Her bicycle wheel was stolen. That then, as plaintiffs have noted, went up beyond that supervisor's level to senior management, and senior management looked at the entirety of the record, including Ms. Kinzer's repeated, I believe it was seven times over roughly a two-week period, that she refused to report to work without the offending mask and was sent home. And a decision was made, we have to be consistent in the enforcement of our policy. I mean, look at why we're here today. So why are, I mean, here you have an individual intimately familiar with Ms. Kinzer's history, very familiar with the circumstances on that particular day, speculating to be sure, but nevertheless saying, you know, if she did not have this history of engaging in this kind of oppositional conduct, if she did not have a reputation as an agitator, this policy of leniency for these kind of excusable tardiness, the outcome might have been different. Why shouldn't that statement, why shouldn't that go to a jury, along with all of the other history we've talked about? I mean, her situation, excuse me. Yeah, I'm sorry. I'll then let you, of course, let you answer. I guess my point, her situation seems different in that respect than the other two plaintiffs. Something is going on on that last critical day that does not apply to the other two plaintiffs. So her situation does seem to be stronger that she might have a case that should go to the jury. Why is that not true? Judge Lippas, I submit that it is not stronger. It is not a material difference for several reasons. When you have progressive disciplinary policies, particularly absence and attendance policies, it is not unsurprising that the final precipitating incident may be a benign reason beyond the fault of an employee. That's why employers have policies like this that give second chances. They don't terminate someone for being late, typically to work, because the person couldn't get in ostensibly because of a stolen bicycle tire. Here there were, I believe, nine or ten separate incidents of attendance problems in a two-week period. The fact that a supervisor, who was not the actual decision-maker, may have mused, well, your absence today may not be your fault. Other people can decide whether to excuse that. In effect, whether to disregard our policy and exercise our discretion in a different way, I submit does not create any plausible inference that the actual decision to follow the policy on the heels of Ms. Kinzer's repeated deliberate flouting of the dress code was retaliatory. It's one person's musing. On that day, were they following the policy? Is the information in the record that on the day she showed up late because of the tire issue, that she also showed up with a mask? That she showed up with a mask? I'm sorry. That day that she was terminated, when she showed up late because of the tire issue, is there information in the record that she also showed up with a mask? No, and I think it's important to remember here that no employee was fired for wearing masks. These plaintiffs were not fired for wearing masks. They were fired for a violation of, effectively, the attendance policy. When they refused to take off their masks, they were sent home. They were not allowed to work while wearing the masks. And that created an attendance violation. We have, between these three plaintiffs, over 20 times that each of them violated the rule and showed up wearing masks and was sent home. And no one at Whole Foods said, you are fired for wearing a mask, or you're fired for insubordination. There was no hostility on that. They treated it as an issue under the attendance policy and then enforced the attendance policy consistently against Ms. Kinzer and the other plaintiffs. Now, Ms. Liz Reardon said multiple times, this is similar to the Travers case. I think, Judge Gallardo, you're the one who pointed out that that was actually quite different. The Travers case involved a very, very different factual circumstances, set of circumstances. They're the plaintiff who was terminated. I think we're quite familiar with Travers. It would really, and I don't want to, if you want to go somewhere else, but it would really help me if you would focus on this testimony by the supervisor. Because it seems to me what we have is we have an opinion by a person who wasn't a decision maker, but who was in management, so had some knowledge. And that person's opinion appears to be, as it's being related to us today, that there was a possibility they might not fire her but for her oppositional behavior. Well, no, I don't think that's the way it was articulated. I think it's the supervisor was saying you were late to work today for, I'm paraphrasing, obviously, for a reason beyond your control. Ms. Kinzer said my bike tire was stolen. I couldn't get here on time. And the supervisor wondering whether discretion would be exercised to excuse the termination under the attendance policy. That's nothing more than one person's musing. That sounds like a good jury argument. That sounds like a good jury argument that, yeah, she was musing. She doesn't really know what's going on, and you should disregard it. That's a good jury argument. Well, I think it's more than a jury argument, Your Honor. I think it's a question of does that bear on the decision? What does that tell you about the decision making of senior management that reviewed it? It tells you nothing, whether it's a coworker. Well, arguably it says that she was terminated because she was an agitator. That's the plaintiff's argument. I know that's the plaintiff's argument, but it doesn't tell you anything. Isn't there some evidence to support that argument? There is not. That evidence doesn't go to the decision makers. It only goes to one supervisor who allegedly or ostensibly raised the question. It doesn't tell you anything about what the decision makers considered or thought. It's merely a statement by someone who was actually removed from the decision. Recognizing I don't have much time, I would like to turn to the NLRB's argument, unless there are additional questions on the summary judgment and the termination issues. Okay. The first question, and this panel raised it, is one of mootness as to whether the question is moot. I submit it is. And there's a critical statement that appears in plaintiff's brief that tells us, in part, why this is moot. The concern raised by plaintiffs and the NLRB is that if the summary judgment is reversed or whole or in part, and if there is a case that proceeds to trial, perhaps this evidence, these messages, might be used at the trial. The board attorney was asked, well, who has seen the messages? Plaintiffs told us this on page 35 of their brief. This is a quote from the brief. Whole Foods itself has never seen these documents, only its attorneys. Only counsel has seen the documents because they were marked attorney's eyes only. And that's clear as day. So in some cases, a plaintiff in their reply brief cited a decision from the Church of Scientology case from the Supreme Court, where the Supreme Court in 1992 said, if privileged documents are produced inappropriately, the plaintiffs have a possessory interest. And even though the water is over the dam, they have a privacy and possessory interest in getting that back. We don't have that here. The concern raised by plaintiffs and the board is not that counsel for Whole Foods has these attorneys-only marked text messages, as plaintiffs note in their brief. It's a concern that maybe hypothetically, if summary judgment is reversed, they might be used in a later proceeding. And that's why the question is moot unless this court reverses and remands, and then it's for the district court, as several of the members of the panel noted, to review relevance and also whether additional restrictions are needed. Judge Burroughs said to the plaintiffs' counsel, if you want to propose additional redactions beyond taking out the names, we will consider that if you believe that's necessary to protect the identity of employees. Second, even if plaintiffs could get beyond the mootness question. What am I missing? It sounds to me like you're making a ripeness argument. Excuse me if I'm not understanding the mootness point. I'm not quite getting that. Well, I'm sorry. What I'm saying is if summary judgment is affirmed, it's moot. No, I understand. And if summary judgment is reversed, then it's a ripeness argument, if I can be more clear. The second point is whether Rule 26 is adequate to protect plaintiffs and the identities and arguable concerted interests of employees, or whether this court should do what no other court has done and adopt this board-made rule. And again, this is why it's hypothetical. Judge Burroughs followed Rule 26 and analyzed the interests of the parties, obviously took steps to protect against the misuse of these messages and the identity of the employees. The judge ordered the redactions. The redactions were made, and the judge said, if there is risk of these redactions being insufficient in identifying other employees, I invite you to propose additional redactions. We also know, as I pointed out, that the messages are solely in the hands of counsel. Finally, if the case is reversed and remanded for a trial, perhaps sometime in 2024, we will be dealing with text messages that are four years old by that point. And the judge can consider whether they have any relevance to the case and whether there is any risk to concerted activity or the privacy of the other employees who were participants in the messages. Does the panel have any more questions on any other of the sets of issues for me? Thank you. I thank you, Your Honors. Thank you, counsel, at this time. If counsel for the appellants will please reintroduce herself on the record. She has a three-minute rebuttal. Thank you. Shannon Lesperdin for plaintiffs. I want to address the mootness and ripeness questions on the discovery issue, but first on this, I just want to read two sentences from the Travers decision. One of them, on the facts viewed favorably to Travers, it remains plausible that the preexisting retaliatory motive tipped the scales when the company decided whether Travers had violated company policy in a way that required his termination. And then later there's discussion of another employee who had also engaged in protected activity who was also alleged to have solicited a tip, and the court said that the defendant made a number of arguments about, well, there's a difference between his situation, it was Mr. Way, and what Mr. Travers did, and the court said that's going to be up to a jury to decide whether one case was really a weaker case for termination than the other. So by the same token, for Mr. Michneau and Ms. Evans, again, we're putting aside the mask issue. They made these other comments that were protected activity. It's going to be up for a jury. It needs to be for a jury to decide whether what they did in continuing to wear the masks really tipped. The defense lawyer just said that Whole Foods didn't fire anyone for wearing a mask. So why did Ms. Evans and why did Mr. Michneau, as well as Ms. Kinzer, get fired? They were discretionary decisions by this company in the face of employees who engage in protected conduct. That is a quintessential jury question for all three of them. Counsel, just very quickly. Yes. With respect to Ms. Kinzer, and apart from this climactic day that we've talked about, I thought there was, through discovery, some e-mails uncovered, found, in which by somebody in the company hierarchy, she was described, again, in somewhat negative terms, perhaps having spoken to the media, contemplating a lawsuit. And that was, again, before the day that we're talking about. Is that correct? Yes. That was much earlier. She was seen in the parking lot leading rallies, talking to the media, talking to an attorney, who happened to be me. They saw her talking to an attorney. They heard a rumor that she was contemplating a lawsuit. Yes, that's all on the record. This was all leading up to it. And who was involved in that e-mail exchange? That was upper management was e-mailing amongst themselves because they were watching what was happening with the employee protests. Are these the individuals who made the final termination decision? Yes. Yes. You made a reference to the supervisor's opinion. I want to make sure I know which one you're talking about. At JA996, there's a supervisor who said maybe if she was a different person or it could have been a different situation, she wouldn't have been given a point. For example, if she hadn't had the trouble before with being sent home for wearing Black Lives Matter masks, that she was a different team member, it might have been a different situation. Is that the testimony that you're referring to when you talk about the supervisor's testimony? Yes. Yes, that was the supervisor who saw her come in late, and she explained her bike tire was stolen, and she said, well, I don't know what they're going to do. They'll have to decide. And then how do you propose we read that, her opinion, that if she hadn't had the trouble before being sent home for wearing Black Lives Matter masks, that she was a different team member, it might have been a different situation? Well, when she said that she was a different team member, maybe she was a different team member who wasn't talking to the media, talking to a lawyer about filing a lawsuit. Again, it's for a jury to decide what was meant by that. Is there any evidence that that comment was known to the ultimate decision makers, or is there any evidence about them directly making similar comments? No, I think the point was that the supervisor can be inferred to know how management works. She wasn't actually one of the decision makers herself, but that is some evidence that someone who knows how Whole Foods makes these decisions would know that it's not really clear. Whole Foods is saying there's no question. She had reached the number of points, so there was no discretion. She had to be terminated, and this is a supervisor recognizing, well, you know, it's actually a discretionary issue, and I don't know how they're going to decide it, which is just like in Travers where the defendant said, if you solicit a tip, that's it, period, end of story. And this court recognized, well, there might be a little bit of nuance there. How strictly is it enforced? Is it really always strictly that enforced? It's a question of fact. And it wasn't clear. For all three of them, it wasn't clear. Whole Foods used its discretion. So when you have protected activity, temporal proximity to adverse action, and discretion, it's got to go to a jury. Can I just very briefly address the mootness and ripeness that you asked about with respect to the discovery issue? Just take a minute, and then that will be it, okay? Yes. Okay. So as my brother just said, the reason why this isn't moot is because these text messages that we tried to keep protected only got revealed to counsel, never got revealed to Whole Foods itself. The whole point, what we're claiming about the privilege, was that these employees never wanted their employer to see these messages. They don't want to be labeled as a troublemaker. They didn't want to be known that they were even involved in this. They're worried that even seeing what these messages were, they would be horrified to have known that their management would ever see it, whether they're still working at the company or not. What the board is explaining is those are rights protected by Section 7. The district court assumes Section 7 in the NLRA didn't even apply here because this wasn't a union setting. But it doesn't matter whether it's a union setting. All we're saying here is that the court should have applied the guess or something like it analysis in making the decision, and the court did not. It's not moot because should this case go back to the trial court, there is going to be this issue about whether or not these get revealed to Whole Foods itself and not just the counsel. Do you agree that if it is sent back that that's a call for the district court in the first instance, or what do you want us to do? What we want you to do because this is, as the board explained, an issue that keeps recurring and district courts that aren't familiar with it and don't have appellate guidance don't know that they should be thinking about the Section 7 interest. So that's why we think the guess analysis or some similar analysis would be proper guidance for the district court in making these balancing decisions about does the defendant really need this? I mean, does the defendant here really need to know what the employees were saying amongst themselves to find a case? Why don't the discovery rules adequately provide for all of these considerations that they're worried about? Because the discovery rules in and of themselves, well, first of all, the discovery rules recognize that there are certain privileges. There may be state law privileges that district courts sort of take into account.  by federal law under the NLRA that should be taken into account when these decisions are made. The court just said, I don't even have to think about the NLRA under Section 7 because this isn't a union workplace, and that was just wrong. Lower courts need guidance on the fact that there is a protected interest in employees engaging in concerted activity regardless of whether it's a union setting or not. They should be able to speak in a concerted way to help themselves and their co-workers without employer intrusion, even through the civil discovery process. What about the plaintiff's own statements? I believe there was one of the texts where she said she wanted to take it as close as she could up to the point of getting fired. Well, so we didn't assert the privilege on behalf of the named plaintiffs. We recognize that by being a party, she put herself out there. The concern were the non-parties, the other employees, anything that could possibly identify them. I understand the district court said that it would allow more redactions, but the concern was even the fact that the employer would know that these conversations were happening would have been abhorrent to these employees and be chilling in and of itself. As a practical matter going forward, employees need to know that they can engage in these concerted activities without the risk of if there's a lawsuit, the employer might find out about it, unless under the guess weighing, the employer really needs it to defend the case. And here we're saying the employer didn't really need it. Thank you. Counsel, I'm sorry, just very quickly. But Whole Foods has said that anonymity is fine with them. They have no interest in knowing who might have been receiving messages from your clients. They are interested in what your client might have been saying to fellow employees, I suppose as a way of demonstrating that she was bound and determined to protest, to continue to perhaps violate the dress code policy. They're interested in what she was saying. They don't care with whom she was communicating. They've said that. Anonymity is fine with them. Well, that was after the district court said there were going to be redactions. They originally requested just all of the communications. And, again, we didn't impose the communications by the named plaintiff herself, Ms. Kinzer. It was other employees. And the fact that there were other communications going on, even if it didn't identify the names of them, there's a real risk, and the employees were very concerned that the employer could figure out who it was who was engaged in these communications, would label them as a troublemaker in the future. If they were going back for a reference, say, or want to reapply to Whole Foods, it will be known that they were engaged in these conversations. But the bigger issue here is that a ruling that allows an employer to get this kind of discovery in a civil lawsuit has a chilling effect on employees, which inhibits them from exercising their rights under Section 7 of the Act. And that's why it's important. It is very hard for these issues to get up to the appellate level, which is why we believe it's important for this court to give guidance to the district court here and lower courts in general that this is a privilege that should be taken into account in weighing discovery disputes. Any more questions? Thank you. Okay. Thank you, Your Honors.